J-S47017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
      :            PENNSYLVANIA
      :
      v.      :
      :
      :
WILLIE L. HARRIS       :
      :
      Appellant      :   No. 3338 EDA 2024

Appeal from the Judgment of Sentence Entered August 9, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005859-2022

BEFORE: PANELLA, P.J.E., OLSON, J., and BECK, J.

MEMORANDUM BY OLSON, J.:            **FILED MARCH 9, 2026**

Appellant, Willie L. Harris, appeals from the judgment of sentence entered on August 9, 2024, as made final by the denial of Appellant's post-sentence motion by operation of law on December 9, 2024. We affirm.

The trial court ably summarized the underlying facts of this case:

> The Commonwealth charged [Appellant] with rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, indecent assault with forcible compulsion, strangulation, burglary, criminal trespass, robbery threatening immediate serious bodily injury, robbery threatening immediate bodily injury, and robbery by committing or threatening to commit involuntary deviate sexual intercourse.[1] Trial commenced on September 6, 2023.

---

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3126(a)(2), 2718(a)(1), 3502(a)(3), 3503(a)(1)(i), 3701(a)(1)(i), 3701(a)(1)(ii), 3701(a)(1)(iii), respectively.

. . .

The Commonwealth called the victim as its first witness. The victim explained her roles and responsibilities as the legal secretary for the Tinari Law Firm located at 1313 Race Street, in Center City, Philadelphia, adjacent to the Juanita Kidd Stout Center for Criminal Justice. On July 5, 2022, the day before the victim's 23rd birthday, she was working alone in an interior office in the early afternoon when she noticed "out of the corner of [her] eye, [an unfamiliar man] leaning over the receptionist counter." The victim greeted him in the reception area, assuming he was a client or needed help finding where to go. [Appellant] said he was "looking for someone named Samantha." When the victim explained no one worked there by that name, he "pushed [past her] and started walking into Mr. Tinari's office." [Appellant] was "very agitated" and looked for money in the office. The victim went into survival mode and offered [Appellant] her earrings, AirPods, a coworker's purse, and her backpack. [Appellant] refused and instead made the victim put her phone down and locked the front door of the office.

[Appellant] then hit the victim across her face with both an open hand and closed fist. She pleaded with him to stop and told him people would return at any minute. When she screamed for help, [Appellant] told he would kill her if she called out again. [Appellant] then strangled her several times to the point where her vision blurred.

[Appellant] threatened to kill her and forced her to perform oral sex on him, holding her wrists down while he pulled his pants down. He then forced his penis into her mouth. [Appellant] then changed course because "he didn't like it." He took off the victim's pants. The victim felt "humiliated" and continued to beg him to stop. [Appellant] threw her to the floor and forced his penis into her vagina. The victim's co-worker returned to the office from her lunch break at that point, which spooked [Appellant] and prompted him to leave.

The victim, still on the floor and trying to get her pants back on, begged her coworker to call 911 because she "just got raped." After the police arrived, the victim was taken to Thomas Jefferson Hospital, where she was given penicillin and evaluated for about six hours. She spoke with two

- 2 -

detectives and signed a statement. The victim never consented to oral or vaginal sex. She tried to return to work but never again felt comfortable going to that law firm.

Kaisa Codner, an intern at the Tinari firm, testified she left the office on July 5, 2022, for about 20 minutes to get lunch in the early afternoon. When she returned, the door was unexpectedly locked. She unlocked the door and took her lunch to the conference room and at that point heard the door from Mr. Tinari's office open. She saw a man leave the office and recognized him. She had seen him lingering outside the building when she left for lunch. She then found the victim on the floor crying hysterically. The victim's clothes were mostly off, her hair was messy, and she looked scared. The victim told her that she had been raped and begged Ms. Codner to lock the door and call 911.

The Commonwealth played the 911 call for the jury. The defense did not object.

James Owen, a registered sexual assault nurse examiner, testified he examined the victim on July 5, 2022, at 9:31 p.m. at the Sexual Assault Response Center, and took rape kit specimens.

Jean Hess, a Forensic Scientist 3 with the Philadelphia Police Department Office of Forensic Sciences, analyzed the DNA samples collected from the investigation, including: the interior and exterior crotch area of [Appellant's] pants, the interior and exterior crotch area of the victim's underwear, the TD Bank bag recovered from the Tinari Office, and the desk from the Tinari Office. Hess also examined DNA samples from the victim's rape kit. Hess was able to conclude to a reasonable degree of medical certainty that the DNA found on the interior and exterior crotch area of [Appellant's] pants matched the victim's DNA. It was "119.8 quadrillion times more likely" that the DNA on [Appellant's] clothes came from the victim as opposed to another random unrelated individual in the Caucasian population.

Detective Enz offered into evidence photos he had taken of the victim's neck that showed red scratch marks.

Detective Modres testified he sent a patrol alert to law enforcement in Philadelphia and New Jersey. Police in Woodbury, New Jersey, responded with a photograph of a man they believed matched the description. [Appellant] was arrested by the Washington Township Police Department on July 7, 2022, in New Jersey.

Detective Poulous introduced surveillance video that showed [Appellant] entering the Tinari Law Firm's office building on July 5, 2022. [Appellant] did not testify.

The jury returned guilty verdicts on September 12, 2023, on all counts except for count one – rape with forcible compulsion.

On August 9, 2024, the Commonwealth and [Appellant's] counsel presented experts on whether the sentencing court should designate [Appellant] a Sexually Violent Predator ("SVP").

The Commonwealth called Dr. John Siegler. Dr. Siegler was appointed to the Sexual Offenders Assessment Board ("SOAB") by the Governor in 2018. He testified he receives information enumerated by the sex offender registration statute to help him assess defendants. SOAB examiners assess from this information whether a person who has been convicted of a sexually violent offense is likely to engage in future predatory sexually violent offenses due to a mental abnormality or personality disorder.

Dr. Siegler considered 14 statutory factors:

> The number of victims, whether the subject exceeded the means necessary to achieve the offense, the nature of the contact with the victim, relationship of the individual to the victim, whether they were acquainted or not, the age of the victim, whether there was unusual cruelty during the commission of the offense, the mental capacity of the victim, the prior offense history, whether the individual completed any prior sentences, whether the individual participated in available programs for sexual offenders, the age of the individual, mental illness or disability, and the behavioral characteristics that contribute to the individual's conduct.

Dr. Siegler determined [Appellant] met both prongs of the SVP designation (mental abnormality and propensity). Dr. Siegler considered [Appellant's] prior offense history. [Appellant] was 19 years old when his criminal record began and accrued more than 30 convictions over the ensuing 30 years. This criminal activity "constituted antisocial behavior over that period of time" and is "indicative of deeply ingrained and rigid dysfunctional thought process, a mental abnormality, that is the impetus for his [current] offending behavior." Dr. Siegler believed [Appellant] "demonstrate[d] a limited capacity for relationships," and a "lack of concern for others based on his repeated offending behavior, impulsivity, and poor problem solving." Dr. Siegler then considered the relationship between [Appellant] and the victim. He concluded [Appellant] initiated contact with the victim "in order to exploit her for his sexual gratification." Dr. Siegler concluded his SVP determination of [Appellant] was made to a reasonable degree of psychological certainty.

The court found that [Appellant] met the definition of a Sexually Violent Predator by clear and convincing evidence.

[Appellant] then addressed the court. He apologized to the victim's family and expressed his years' long battle with drugs and addiction. He asked for mercy.

The court [sentenced Appellant to serve an aggregate term of 15 to 30 years in prison, followed by five years of probation, for his crimes].

Trial Court Opinion, 5/12/25, at 1-8 (citations and some capitalization omitted).

Following the denial of Appellant's post-sentence motion by operation of law, Appellant filed a timely notice of appeal. Appellant raises ten issues on appeal:

[1.] Prior to trial, did the court improperly deny [Appellant's] request for trial counsel to be removed due to irreconcilable differences and new counsel be appointed, and [Appellant]

was forced to proceed to trial where he was found guilty of IDSI, burglary, robbery and related charges?

[2.] Did the court improperly make a finding that [Appellant] was a "sexually violent predator" where the record does not reflect that the standard of clear and convincing evidence was met where the court heard testimony of two experts with differing opinions on whether [Appellant] met the criteria required to be found a "sexually violent predator?"

[3.] Did the court err when it imposed an aggregate sentence of 15-30 years incarceration because the sentence was excessive, more than necessary to protect the public, punish the defendant and rehabilitate [Appellant]?

[4.] Did the court impermissibly factor at [Appellant's] sentencing, the [Appellant's] prior arrests that did not result in convictions, as well as including his status as a "sexually violent predator?"

[5.] Did the court err when it sentenced [Appellant] to aggravated sentences that ran consecutively due to the inflaming nature of the media coverage for this matter; the improper "victim impact" testimony under 42 Pa.C.S. § 9738 submitted by the Commonwealth before defense counsel could object; allowed testimony given by the victim's employer; and the Commonwealth's testimony that something may have happened during his juvenile years, but was lacking a scintilla of evidence. In addition, [the trial] court failed to fully weigh the considerable remorse [Appellant] showed during his allocution; his decades long battle with addiction; the system's inability to focus on his rehabilitative needs during his previous contacts; his abuse as a child; the mental health challenges he suffered through his life; lastly, but vitally, his significant attempts to make things right through the extraordinary mitigating factor?

[6.] Did the court err where the verdicts for all of the charges at trial were against the weight of the evidence and the court failed to award a new trial?

[7.] Did the court err when it improperly allowed the 911 audio tapes to be played in front of the jury and admitted as evidence because they we inadmissible as hearsay?

[8.] Did the court err where it failed to set aside the verdict where the verdicts for all of the charges were insufficient?

[9.] Did the court err where it failed to grant the motion for mistrial either during trial or after trial?

[10.] Did the court err when it removed juror number seven and seated juror thirteen in their place after deliberations had begun?

Appellant's Brief at 5-7.

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinion of the able trial court judge, the Honorable Christopher R. Hall. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in Judge Hall's well-reasoned May 12, 2025 opinion. Therefore, we affirm on the basis of Judge Hall's able opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Hall's May 12, 2025 opinion.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/9/2026